**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| ADAIR DA'ANN NORWOOD, )<br><br>Plaintiff, )<br><br>v. )<br><br>EQUIFAX INFORMATION SERVICES )<br>LLC; EXPERIAN INFORMATION )<br>SOLUTIONS, INC..; and TRANS UNION )<br>LLC, )<br><br>Defendants. ) | Case No. 6:23-cv-431<br><br>JURY TRIAL REQUESTED |

## COMPLAINT

ADAIR DA'ANN NORWOOD ("Norwood" or "Plaintiff") brings this Complaint against Equifax Information Services, LLC ("Defendant Equifax" or "Equifax"), Experian Information Solutions, Inc. ("Defendant Experian" or "Experian"), and Trans Union, LLC ("Defendant Trans Union" or "Trans Union") (collectively, "Defendants"), for actual, statutory, and punitive damages, costs, and attorney's fees, for violations of the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*, arising out of Defendants' mixing of Plaintiff's credit files, credit history, and personal identification information with that of her twin brother.

1.      In fact, for nearly all her adult life, Plaintiff has been denied her own individual credit report because some, or all, of her personal credit information has been merged and mixed up with her twin brother's credit files and reports by each of the Defendants. This occurred even though her twin brother is the opposite sex, has an entirely different first name, middle name, and Social Security number than

Plaintiff.

2.     Consequently, Plaintiff has suffered and continues to suffer damages, including denial of credit, lost credit opportunities, reputational harm, invasion of privacy, emotional distress, physical illness, embarrassment, and humiliation.

## PRELIMINARY STATEMENT

3.     The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual citizens. Data technology, whether it be used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individuals to flow immediately to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients, and all of society should benefit from the resulting convenience and efficiency.

4.     Unfortunately, however, this information has also become readily available for and subject to mishandling and misuse. Individuals can sustain substantial damage, both emotionally and economically, whenever inaccurate information or fraudulent information is disseminated about them.

5.     The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

6.     The CRAs sell to readily paying subscribers (i.e., retailers, landlords, lenders, automobile dealers, potential employers, and other similar interested

parties) information commonly called "consumer reports," concerning individuals who may be applying for retail credit, to lease an apartment, to obtain a mortgage, auto loan, employment, or the like.

7.      "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064(AJT/TRJ), 2011 E.S. Dist. LEXIS 28896, *1, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

8.      Congress made the following findings when it enacted the FCRA in 1970:

1) The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

2) An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

3) Consumer reporting agencies have assumed a vital role in assembling and evaluation consumer credit and other information on consumers.

4) There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4). Thus, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9.      Since 1970, when Congress enacted the FCRA, as amended, 15 U.S.C.

§ 1681 *et seq.*, federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

10. "Mixed files" create a false description and representation of a consumer's credit history.

11. A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

12. The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is the subject of that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

13. Mixed files are not a new phenomenon. Equifax, Experian, and Trans Union have been put on notice of the existence of mixed files and the fact that their procedures for creating credit files, including their matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonio Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

14. More recently, all three credit bureaus, Equifax, Experian, and Trans Union, have been the subject of numerous state attorney general actions relating to their mixed file problems.

15. In 2012, Ohio Attorney General Mike DeWine initiated a multistate investigation of the credit reporting practices of consumer reporting agencies Experian, Trans Union and Equifax, including the incidence of mixed files. Thirty-

one states participated in the enforcement action, which resulted in a $6,000,000 settlement with Experian, Equifax, and Trans Union.[1] Pursuant to the settlement, the three CRAs promised, among other things, "to implement an escalated process for handling complicated disputes – such as those involving . . . mixed files — where one consumer's information is mixed with another's."[2]

16.     In another example, in 2015, the New York Attorney General filed charges and settled claims with Equifax, Experian, and Trans Union over mixed files. *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*[3]

17.     Notwithstanding Equifax, Experian, and Trans Union's notice and being subject to repeated enforcement actions, mixed files persist despite consumers' unique personal identifying information, such as Social Security numbers, dates of birth, and addresses.

18.     Further, mixed files result in the disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both.

---

[1]     https://www.texasattorneygeneral.gov/news/releases/attorney-general-paxton-announces-6-million-settlement-credit-reporting-agencies (last visited May 26, 2023).

[2]     *Id.*

[3]     https://ag.ny.gov/press-release/2015/ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three (Last visited May 26, 2023); https://ag.ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf (Last visited May 26, 2023).

19.     Equifax, Experian, and Trans Union have each been sued thousands of times wherein an allegation was made that Equifax, Experian, and Trans Union violated the FCRA. Moreover, Equifax, Experian, and Trans Union are sued, at a minimum, hundreds of times each year wherein an allegation is made that they mixed a consumers' credit file with that of another person.

20.     Private FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

21.     For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case No. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them dispute Ms. Thomas' numerous disputes. The jury awarded Ms. Thomas $300,000 in actual damages and $5 million in punitive damages. Despite the verdict, Equifax, Experian, and Trans Union continue to mix consumers' credit files with other consumers' credit files.

22.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000 in actual damages and $2.7 million in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, Equifax, Experian, and Trans Union continue to mix consumers' credit files with other consumers' credit files.

23.    In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000 in actual damages and $18.4 million in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to unmix them despite Ms. Millers' numerous disputes. Despite the verdict, Equifax, Experian, and Trans Union continue to mix consumers' credit files with other consumers' credit files.

24.    Most recently, a jury assessed a $60 million verdict against Trans Union for mixing innocent American citizens with terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC,* No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom. Ramirez v. TransUnion LLC*, 951 F.3d 1008 (9th Cir. 2020). Despite the verdict, Equifax, Experian, and Trans Union continue to mix consumers' credit files with other consumers' credit files.

25.    "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co.*

*of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

26.   No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

27.   Finally, the Federal Trade Commission has specifically warned consumer reporting agencies, including Equifax, Experian, and Trans Union, to review their procedures when a mixed file case occurs.

28.   Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

## THE PARTIES

### Plaintiff Adair Da'Ann Norwood

29.   Plaintiff Adair Da'Ann Norwood ("Norwood") is a natural person who resides in the City of Waco, State of Texas, and is a "consumer" as defined by the FCRA at 16 U.S.C. § 1681a(c).

### Defendant Equifax Information Services LLC

30.   Defendant Equifax Information Services, LLC ("Defendant Equifax" or "Equifax") is a foreign limited liability company authorized to do business in the State of Texas, including in the Western District.

31.   Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling,

evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

**Defendant Experian Information Solutions, Inc.**

32.    Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a foreign limited liability company authorized to do business in the State of Texas, including in the Western District.

33.    Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

**Defendant Trans Union, LLC**

34.    Defendant Trans Union, LLC ("Defendant Trans Union" or "Trans Union") is a foreign limited liability company authorized to do business in the State of Texas, including in the Western District.

35.    Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

**JURISDICTION AND VENUE**

36.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allow claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

37.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTS

### Summary of the Fair Credit Reporting Act

38.    The FCRA is a comprehensive statutory scheme governing the conduct of CRAs such as Defendants. When Congress enacted the FCRA it found that the "banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system." 15 U.S.C. § 1681(a)(1).

39.    Congress recognized that CRAs, such as Defendants Equifax, Experian and Trans Union, "have assumed a vital role in assembling and evaluating consumer credit and other information on consumers." 15 U.S.C. § 1681(a)(3). Therefore, Congress determined that there "is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." 15 U.S.C. § 1681(a)(4).

40.    In enacting the FCRA, Congress was not only concerned about the credibility of the banking system and the privacy of consumers. It also recognized a need to "prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No.91-517, 91st Cong., 1st Sess. 1 (1969).

41.    More recently, according to the Consumer Financial Protection Bureau, "As the range and frequency of decisions that rely on credit reportshave increased, so has the importance of assuring the accuracy of these reports."[4]

42.    The purpose of the FCRA is to require consumer reporting agencies to "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personal, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information…." 15 U.S.C. § 1681(b).

43.    The FCRA further requires that when preparing consumer reports a consumer reporting agency must follow "reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b).

44.    Information on a consumer report is inaccurate when it is "'patently incorrect' or when it is 'misleading in such a way and to such an extent that it can be expected to [have an] adverse'" effect." *Dalton v. Capital Associated Indus.,* 257 F.3d 409, 415 (4th Cir. 2001) (citation omitted).

### The Credit Bureaus' Processing of Credit Information

45.    The three major credit bureaus, Equifax, Experian, and Trans Union regularly receive information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information

---

[4] Consumer Financial Protection Bureau, <u>Key Dimensions and Processes in the U.S. CreditReporting System</u>, at 5 (December 2012).

vendors, and others.

46.  These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

47.  Equifax, Experian, and Trans Union collect information from thousands of furnishers.

48.  The process by which Equifax, Experian, and Trans Union receive, sort, and store information is largely electronic.

49.  Furnishers report credit information to Equifax, Experian, and Trans Union using coded tapes that are transmitted to Equifax, Experian, and Trans Union on a monthly basis through software known as Metro 2.

50.  Equifax, Experian, and Trans Union take the credit information reported by furnishers and create consumer credit files.

51.  Equifax, Experian, and Trans Union maintain credit files on more than 200 million consumers.

52.  Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

**The Credit Bureaus' Mixed File Problem**

53.  Equifax, Experian, and Trans Union know that different consumers can have similar names.

54.  Equifax, Experian, and Trans Union know that different consumers can have similar Social Security numbers.

55. Equifax, Experian, and Trans Union know that different consumers with similar names can also have similar Social Security numbers.

56. Equifax, Experian, and Trans Union know that public records often do not contain identifying information, such as Social Security numbers or dates of birth.

57. Equifax, Experian, and Trans Union match tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

58. Equifax, Experian, and Trans Union accomplish this matching of credit information to consumer credit files using certain matching algorithms or database rules.

59. Sometimes Equifax, Experian, and Trans Union's matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what is commonly known in the industry as a mixed or merged credit file.

60. Mixed files are not a new phenomenon. In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the three major CRAs, Equifax, Experian, and Trans Union, regarding their significant failures and deficiencies with respect to mixed files.

61. Despite Equifax, Experian, and Trans Union's long-standing and specific

knowledge of the mixed file problem, Plaintiff's credit reports were still generated by Equifax, Experian and Trans Union containing information belonging to another consumer.

62. A mixed or merged credit file is the result of Equifax, Experian, and Trans Union inaccurately mixing personal identification information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

63. There are many different possible causes for the mixing or merging of credit files but all of them relate in one way or another to the algorithms (the database rules) used by Equifax, Experian, and Trans Union to match personal identification information and credit information, including public record information, to a particular consumer's credit file.

64. The success or failure of these algorithms and rules is both a function of the rules themselves and of the information provided by the furnishers of the credit tradeline information to Equifax, Experian, and Trans Union.

65. A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to Equifax, Experian, and Trans Union.

66. These rules also determine which credit files are selected by the algorithm and merged to create a complete consumer report.

67. Therefore, a mixed consumer report is sometimes the result of the mixing

of two or more consumer credit files belonging to different consumers into one consumer report.

### Sun Loan Denies Plaintiff's Credit Application on June 11, 2021

68.   On or about June 11, 2021, Plaintiff needed a credit card and applied for a Sun Loan line. After submitting a credit application, Plaintiff received correspondence from Sun Loan informing her that her credit application was denied based on the contents of her Trans Union credit report.

69.   Sun Loan relied on the contents of Plaintiff's Trans Union credit report at the time it denied Plaintiff's credit application. As of June 11, 2021, the date Sun Loan accessed Plaintiff's Trans Union credit report, it was mixed with her twin brother's personal and credit account information.

70.   TransUnion's inaccurate credit reporting adversely impacted Plaintiff's credit score and caused her credit application to be denied by Sun Loan.

### Plaintiff Was Repeatedly Denied for Auto-Loan Related Credit Opportunities in June 2021

71.   In or about June 2021, Plaintiff, while in her mid-20s and working in the healthcare industry, began looking to build her credit profile to better help secure a good financial future.

72.   Over two weekends in June 2021, Plaintiff visited car dealerships, including K&G Motors/Chevrolet of West ("Chevrolet of West")[5], Volkswagen of

---

[5] K&G MOTORS/CHEVROLET OF WEST, 225 T M W Pkwy, West. TX 76691; (254) 826-5377 (Experian; Trans Union; and Equifax)

Waco, and Orr Motors of Waco/Greg May Hyundai ("Greg May Hyundai"), to purchase a new automobile.

73. On or about June 17, 2021, at Plaintiff's direction and approval, the Chevrolet of West dealership obtained copies of Plaintiff's credit reports from Equifax, Experian, and TransUnion.

74. Plaintiff was notified by the finance director at Chevrolet of West that her credit applications had been denied by numerous potential lenders including:

**June 17, 2021**

GM FINANCIAL
801 CHERRY ST STE 3600
FT WORTH, TX 76102
(Equifax)

FIRST INVESTORS FIN SERVICES/CNA
5757 WOODWAY DRIVE SUITE 400
HOUSTON, TX 77057
1-713-273-5236
(Equifax)

CAPITAL ONE AUTO FINANCE
15000 CAPITAL ONE DRIVE PO# USBNK518211
RICHMOND, VA 23238
(Equifax)

CAPITAL ONE AUTO FINANCE
PO Box 259407
Plano, TX 75025
(Experian)

CAPITAL ONE AUTO FINANCE
3905 N. Dallas Parkway
Plano, TX 75093
(800) 946-0332
(TransUnion)

ALLY FINANCIAL
P.O BOX 380901 /PO1000782
BLOOMINGTON, MN 55438
1-800-200-4622
(Equifax)

ALLY FINANCIAL
200 Renaissance Center
Detroit, MI 48243
(Experian)

GLOBAL LENDING SERVICES, INC.
1200 BROOKFIELD
GREENVILLE, SC 29607
1-877-298-1345
(Equifax)

GLOBAL LENDING SERVICES, INC.
3399 Peachtree Rd. NE, Suite 400
Atlanta, GA 30326
(Experian)

FIRST INVESTORS FINANCIAL SERVICES, INC.
5757 WOODWAY DRIVE CORPORATION/FIRST
INVESTORS FI
HOUSTON, TX 77057
1-713-273-5236
(Equifax)

LENDERS PROTECTION, LLC (CNA)
1501 S. Mopac Expy., Suite 450
Austin, TS 78746
(Equifax)

WELLS FARGO DEALER SERVICES
9004 BROOK GARDEN CT #203 - D9048010
RALEIGH, NC 27615
(Equifax)

BBVA USA
PO Box 11830
Birmingham, AL 35202
(Experian)

EXETER FINANCE, LLC
2101 West John Carpenter Freeway
Irving, TX 75063
(Experian)

WESTLAKE FINANCIAL
4751 Wilshire Blvd
Los Angeles, CA 90010
(Experian)

SANTANDER CONSUMER USA
5201 Rufe Snow Dr. North
Richland Hills, TX 76180
(Experian)

FLAGSHIP CREDIT ACCEPTANCE
PO Box 3807
Coppell. TX 75109
(800) 707-0114
(TransUnion)

75.    At the time of Plaintiff's credit application with the Chevrolet of West

dealership on or about June 17, 2021, Equifax, Experian, and Trans Union

published credit reports to one or more of the above lenders that contained mixed

personal identification information and credit account information, which belongs

to her twin brother.

76.    Plaintiff's credit applications with each of the above lenders were denied

as a direct result of the inaccurate information contained within her Equifax,

Experian, and Trans Union credit reports, which adversely impacted her debt-to-

income ratio and overall credit scores.

77.    In the months that followed, Plaintiff applied for other various credit

opportunities and said credit applications were denied because of inaccurate and

mixed personal and credit account information reported within her Equifax, Experian, and Trans Union credit reports.

**June 18, 2021**

78.   On or about June 18, 2021, at Plaintiff's direction and approval, the Volkswagen of Waco dealership[6] obtained copies of Plaintiff's credit reports from Equifax, Experian, and TransUnion.

79.   Plaintiff was notified by the finance director at Volkswagen of Waco that her credit applications had been denied by numerous potential lenders including:

PENTAGON FCU
2930 EISENHOWER AVE FOREST GLEN
ALEXANDRIA, VA 22314
(Equifax)

ALLY FINANCIAL
P.O BOX 380901 /PO1000782
BLOOMINGTON, MN 55438
1-800-200-4622
(Equifax)

ALLY FINANCIAL
200 Renaissance Center
Detroit, MI 48243
(Experian)

VW CREDIT INC
2333 WAUKEGAN RD PO # (4239)
DEERFIELD, IL 60015
1-847-371-4310
(Equifax)

VW CREDIT INC
22823 NW Bennett St.

---

[6] VOLKSWAGEN OF WACO, 2301 W. Loop 340, Waco, TX 76712, 1-254-265-6868 (Equifax; Experian; and Trans Union).

Hillsboro. OR 97124
(Experian & TransUnion)

80.    At the time of Plaintiff's credit application with the Volkswagen of Waco dealership on or about June 18, 2021, Equifax, Experian, and Trans Union published credit reports to one or more of the above lenders that contained mixed personal identification information and credit account information, which belongs to her twin brother.

81.    Plaintiff's credit applications with each of the above lenders were denied as a direct result of the inaccurate information contained within her Equifax, Experian, and Trans Union credit reports, which adversely impacted her debt-to-income ratio and overall credit scores.

82.    Despite these numerous denials, Plaintiff continued to pursue the purchase of a new automobile.

**June 25, 2021**

83.    On or about June 25, 2021, at Plaintiff's direction and approval, the Greg May Hyndai dealership[7] obtained copies of Plaintiff's credit reports from Equifax, Experian, and Trans Union.

84.    Plaintiff was notified by the finance director at Greg May Hyundai that her credit applications had been denied by numerous potential lenders including:

ALLY FINANCIAL
P.O BOX 380901 /PO1000782
BLOOMINGTON, MN 55438

---

[7] ORR MOTORS OF WACO TWO INC/GREG MAY HYUNDAI, 1501 W LOOP 340, WACO, TX 76712; 1-254-420-2366.

1-800-200-4622
(Equifax)

ALLY FINANCIAL
200 Renaissance Center
Detroit, MI 48243
(Experian)

GLOBAL LENDING SERVICES, INC.
1200 BROOKFIELD
GREENVILLE, SC 29607
1-877-298-1345
(Equifax; Experian)

HYUNDAI MOTOR FINANCE CORP
10550 TALBERT AVE PO 2000382
FOUNTAIN VALLEY, CA 92708
1-678-501-3655
(Equifax)

HYUNDAI MOTOR FINANCE CORP
10550 TALBERT AVE PO 2000382
FOUNTAIN VALLEY, CA 92708
1-800-523-4030
(Equifax)

WESTLAKE FINANCIAL
4751 Wilshire Blvd
Los Angeles, CA 90010
(Experian)

SANTANDER CONSUMER USA
5201 Rufe Snow Dr. North
Richland Hills, TX 76180
(Experian)

85. At the time of Plaintiff's credit application with the Greg May Hyndai dealership on or about June 18, 2021, Equifax, Experian, and Trans Union published credit reports to one or more of the above lenders that contained mixed personal identification information and credit account information, which belongs

to her twin brother.

86.     Plaintiff's credit applications with each of the above lenders were denied as a direct result of the inaccurate information contained within her Equifax, Experian, and Trans Union credit reports, which adversely impacted her debt-to-income ratio and overall credit scores.

## Plaintiff Applies for Credit with Upgrade

87.     On or about July 6, 2021, Plaintiff submitted a credit application for a line of credit with Upgrade.

88.     On or about July 6, 2021, Upgrade obtained a copy of Plaintiff's Experian, Equifax, and Trans Union credit reports.

89.     The credit reports that Experian, Equifax, and Trans Union published to Upgrade regarding Plaintiff were inaccurate because they were mixed personal identification information and credit account information, which belongs to her twin brother.

90.     Shortly thereafter, Plaintiff received correspondence from Upgrade notifying her that she was only approved for credit in the amount of $1,500.00, and at an interest rate far exceeding market rates.

91.     Upgrade was only willing to approve Plaintiff for such unfavorable terms due to the contents of her Experian, Equifax, and Trans Union credit reports, which contained personal identification information and credit account tradelines that do not belong to Plaintiff, which adversely impacted her debt-to-income ratio and overall credit score.

## Paypal via SyncPaypal and American First Finance Deny Plaintiff's Credit Applications on July 9, 2021

92. On or about July 9, 2021, Plaintiff needed credit card lines and applied online for both Paypal via SyncPaypal and American First Finance lines. After submitting credit applications, Plaintiff received correspondence from both Paypal via SyncPaypal and American First Finance informing her that her credit applications were denied based on the contents of her Trans Union credit report.

93. Both Paypal via SyncPaypal and American First Finance relied on the contents of Plaintiff's Trans Union credit report at the time they denied Plaintiff's credit applications. As of July 9, 2021, the date both Paypal via SyncPaypal and American First Finance accessed Plaintiff's Trans Union credit report, Plaintiff's Trans Union credit report was mixed with personal identification information and credit account information, which belongs to her twin brother.

94. Trans Union's inaccurate credit reporting adversely impacted Plaintiff's credit score and caused her credit applications to be denied by both Paypal via SyncPaypal and American First Finance.

## Plaintiff Was Again Denied for Auto-Loan Related Credit in August 2021

### August 7, 2021

95. On or about August 7, 2021, at Plaintiff's direction and approval, the Volkswagen of Waco dealership again obtained copies of Plaintiff's credit reports from Equifax, Experian, and Trans Union.

96. Plaintiff was notified by the finance director at Volkswagen of Waco that

her credit applications had been denied by numerous potential lenders including:

A+ FEDERAL CREDIT UNION
6420 East Highway 290
Austin, TX 78723
(Experian)

ALLY FINANCIAL
200 Renaissance Center
Detroit, MI 48243
(Experian)

ALLY FINANCIAL
P.O BOX 380901 /PO1000782
BLOOMINGTON, MN 55438
1-800-200-4622
(Equifax)

WELLS FARGO DEALER SERVICES
9004 BROOK GARDEN CT #203 - D9048010
RALEIGH, NC 27615
(Equifax)

97. At the time of Plaintiff's credit application with the Volkswagen of Waco dealership on or about August 7, 2021, Equifax and Experian published credit reports to one or more of the above lenders that contained mixed personal identification information and credit account information, which belongs to her twin brother.

98. Plaintiff's credit applications with each of the above lenders were denied as a direct result of the inaccurate information contained within her Equifax and Experian credit reports, which adversely impacted her debt-to-income ratio and overall credit scores.

99. Despite these numerous denials, Plaintiff finally succeeded with the purchase of a new automobile using her then current automobile creditor for a loan,

VW Credit, Inc. The loan amount totaled approximately $27,915.00 and was at a substantially higher interest rate than market rates at the time. Equifax, Experian, and TransUnion all published credit reports to VW Credit that contained mixed personal identification information and credit account information, which belongs to Plaintiff's twin brother, resulting in an adverse impact to Plaintiff's debt-to-income ratio and overall credit scores.

### Plaintiff Applies for Credit Card with First Central Credit Union

100. On or about September 10, 2021, Plaintiff submitted a credit application for a credit card to First Central Credit Union ("FCCU").

101. On or about September 10, 2021, FCCU obtained a copy of Plaintiff's Experian, Equifax, and Trans Union credit reports.

102. The credit reports that Experian, Equifax, and Trans Union published to FCCU regarding Plaintiff were inaccurate because they were mixed with her twin brother's personal identification information and credit account information.

103. Shortly thereafter, Plaintiff received correspondence from FCCU notifying her that she was only approved for credit in the amount of $300.00 and at an interest rate far exceeding market rates.

104. FCCU was only willing to approve Plaintiff for such unfavorable terms due to the contents of her Experian, Equifax, and Trans Union credit reports that contained personal identification information and credit account tradelines, which do not belong to Plaintiff, adversely impacting her debt-to-income ratio and overall credit scores.

**Plaintiff Was Denied for Car Refinancing in September 2021**

105. Because her new VW Credit auto loan was effectuated at such a high interest rate and other unfavorable terms, Plaintiff began searching for refinancing alternatives.

106. On September 10, 2021 and September 20, 2021, Plaintiff applied for car refinancing from: (1) Flagship Credit Acceptance (TransUnion); (2) Exeter Finance (Experian); and (3) First Investors Financial Services (Equifax).

107. After submitting her credit applications, Plaintiff received notifications from each informing her that her credit applications were denied based on the contents of her TransUnion, Experian, and/or Equifax credit reports.

108. All three lenders relied on at least one of Plaintiff's Trans Union, Experian, or Equifax credit reports at the time they denied Plaintiff's credit applications. As of September 2021, the month the three lenders accessed Plaintiff's credit reports, Plaintiff's credit reports were mixed with personal identification information and credit account information, which belong to her twin brother.

109. Trans Union, Experian, and/or Equifax's inaccurate credit reporting adversely impacted Plaintiff's credit score and caused her car refinance credit applications to be denied by all lenders.

**Plaintiff Applies for Credit with Guarantee Loan Service**

110. On or about December 24, 2021, Plaintiff submitted a credit application for a line of credit with Guarantee Loan Service.

111. On or about December 24, 2021, Guarantee Loan Service obtained a copy

of Plaintiff's Equifax and Trans Union credit reports.

112. The credit reports that Equifax and Trans Union published to Guarantee Loan Service regarding Plaintiff were inaccurate because they were mixed with personal identification information and credit account information belonging to Plaintiff's twin brother.

113. Shortly thereafter, Plaintiff received correspondence from Guarantee Loan Service notifying her that she was only approved for credit in the amount of $300.00 and at an interest rate far exceeding market rates.

114. Guarantee Loan Service approved Plaintiff for these unfavorable terms due to the contents of her Equifax and Trans Union credit reports, which contained credit account tradelines that do not belong to Plaintiff, adversely impacting her debt-to-income ratio and overall credit score.

**Plaintiff Was Denied for Car Refinancing in January and February 2022**

115. Because her new VW Credit auto loan was effectuated at such a high interest rate and other unfavorable terms, Plaintiff further searched for refinancing alternatives.

116. On January 25, 2022, January 31, 2022, and February 22-23, 2022, Plaintiff again applied for car refinancing from the following lenders: (1) Flagship Credit Acceptance (Trans Union); (2) Exeter Finance (Experian); (3) Regional Acceptance (Trans Union); (4) World Acceptance (Equifax); (5) Bank of America (Experian) and Oklahoma Educators Credit Union (Experian); (6) Blue Federal Credit Union (Experian); and (7) DATCU Credit Union (Trans Union).

117. After submitting her credit applications, Plaintiff received notifications from each of these seven (7) lenders informing her that her credit applications were denied based on the contents of her Trans Union, Experian, and/or Equifax credit reports.

118. All seven lenders relied on at least one of Plaintiff's Trans Union, Experian, and/or Equifax credit reports at the time they denied Plaintiff's credit applications. As of January and February 2022, the month the three lenders accessed Plaintiff's credit reports, Plaintiff's credit reports were mixed with personal identification information and credit account information, which belongs to Plaintiff's twin brother.

119. Trans Union, Experian, and/or Equifax's inaccurate credit reporting adversely impacted Plaintiff's credit score and caused her January and February 2022 car refinance credit applications to be denied by all.

120. In the case of Trans Union supplied data to DATCU, Plaintiff was offered a car refinance but on substantially worse terms than those requested.

121. Nevertheless, DATCU did end up offering credit that was acceptable to Plaintiff on better terms than her VW Credit auto loan; consequently, Plaintiff effectuated the refinance.

**Plaintiff Applies for Credit with Sun Loan Company**

122. On or about February 1, 2022, Plaintiff submitted a credit application for a line of credit with Sun Loan Company.

123. On or about February 1, 2022, Sun Loan Company obtained a copy of

Plaintiff's Equifax and Trans Union's credit reports.

124. The credit reports that Experian, Equifax, and Trans Union published to Sun Loan Company regarding Plaintiff were inaccurate because they were mixed with personal identification information and credit account information, which belongs to her twin brother.

125. Shortly thereafter, Plaintiff received correspondence from Sun Loan Company notifying her that she was only approved for credit in the amount of $600.00 and at an interest rate far exceeding market rates.

126. Sun Loan Company approved Plaintiff for these terms due to the contents of her Experian, Equifax, and Trans Union credit reports, which contained credit account tradelines that do not belong to Plaintiff, adversely impacting her debt-to-income ratio and overall credit score.

## Plaintiff Applies for Credit with Affirm

127. On or about February 25, 2022, Plaintiff submitted a credit application for a line of credit with Affirm.

128. On or about February 25, 2025, Affirm obtained a copy of Plaintiff's Experian credit report.

129. The credit report that Experian published regarding Plaintiff was inaccurate because it was mixed with that of her twin brother's personal identification information and credit account information.

130. Shortly thereafter, Plaintiff received correspondence from Affirm notifying her that she was only approved for credit in the amount of $345.00 and at

an interest rate far exceeding market rates.

131. Affirm approved Plaintiff for these terms due to the contents of her Experian credit report, which contained credit account tradelines that do not belong to Plaintiff, adversely impacting her debt-to-income ratio and overall credit score.

## American Express Denies Plaintiff's Credit Application

132. On or about February 27, 2022, Plaintiff needed a credit card and applied online for an American Express credit card. After submitting a credit application, Plaintiff received correspondence from American Express informing her that her credit application was denied based on the contents of her Trans Union report.

133. American Express relied on the contents of Plaintiff's Trans Union credit report at the time it denied Plaintiff's credit application. As of February 27, 2022, the date American Express accessed Plaintiff's Trans Union credit report, it was mixed with that of her twin brother's personal and credit account information.

134. Trans Union's inaccurate credit reporting adversely impacted Plaintiff's credit score and caused her credit application to be denied by American Express.

## Plaintiff Applies for Credit with World Finance

135. On or about March 10, 2022, Plaintiff submitted a credit application for a line of credit with World Finance.

136. On or about March 10, 2022, World Finance obtained a copy of Plaintiff's Equifax and Trans Union credit reports.

137. The credit reports that Equifax and Trans Union published to World Finance regarding Plaintiff were inaccurate because they were mixed with personal

identification information and credit account information, which belongs to Plaintiff's twin brother.

138. Shortly thereafter, Plaintiff received correspondence from World Finance notifying her that she was only approved for credit in the amount of $500.00 and at an interest rate far exceeding market rates.

139. World Finance approved Plaintiff for these unfavorable terms due to the contents of her Equifax and Trans Union credit reports, which contained credit account tradelines that do not belong to Plaintiff, adversely impacting her debt-to-income ratio and overall credit scores.

### Comenity Capital/IKEA Denies Plaintiff's Credit Application

140. On or about March 12/15, 2022, Plaintiff needed a credit card and applied online for a Comenity Capital/IKEA credit card. After submitting a credit application, Plaintiff received correspondence from Comenity Capital/IKEA informing her that her credit application was denied based on the contents of her Experian credit report.

141. Comenity Capital/IKEA relied on the contents of Plaintiff's Experian credit report at the time it denied Plaintiff's credit application. As of March 12/15, 2022, the date Comenity Capital/IKEA accessed Plaintiff's Experian credit report, Plaintiff's credit report was mixed with personal identification information and credit account information, which belongs to Plaintiff's twin brother.

142. Experian's inaccurate credit reporting adversely impacted Plaintiff's credit score and caused her credit application to be denied by Comenity

Capital/IKEA.

## Citibank Denies Plaintiff's Credit Application

143. On or about May 2, 2022, Plaintiff needed a credit card and applied online for a Citibank credit card. After submitting a credit application, Plaintiff received correspondence from Citibank informing her that her credit application was denied based on the contents of her Experian credit report.

144. Citibank relied on the contents of Plaintiff's Experian credit report at the time it denied Plaintiff's credit application. As of May 2, 2022, the date Citibank accessed Plaintiff's Experian credit report, Plaintiff's credit report was mixed with personal identification information and credit account information, which belongs to Plaintiff's twin brother.

145. Experian's inaccurate credit reporting adversely impacted Plaintiff's credit score and caused her credit application to be denied by Citibank.

## JP Morgan Chase Denies Plaintiff's Credit Application

146. On or about May 5, 2022, Plaintiff needed a credit card and applied online for a JP Morgan Chase credit card. After submitting a credit application, Plaintiff received correspondence from JP Morgan Chase informing her that her credit application was denied based on the contents of her Experian credit report.

147. JP Morgan Chase relied on the contents of Plaintiff's Experian credit report at the time it denied Plaintiff's credit application. As of May 5, 2022, the date JP Morgan Chase accessed Plaintiff's Experian credit report, Plaintiff's credit report was mixed with personal identification information and credit account information,

which belongs to Plaintiff's twin brother.

148. Experian's inaccurate credit reporting adversely impacted Plaintiff's credit score and caused her credit application to be denied by JP Morgan Chase.

## Rocket Mortgage Denies Plaintiff's Mortgage Preapproval

149. On or about July 5, 2022, Plaintiff was looking into doing some potential home buying and applied online for a Rocket Mortgage preapproval. After submitting a credit application, Plaintiff received correspondence from Rocket Mortgage informing her that her credit application was denied based on the contents of her Equifax credit report.

150. Rocket Mortgage relied on the contents of Plaintiff's Equifax credit report at the time it denied Plaintiff's credit application. As of July 5, 2022, the date Rocket Mortgage accessed Plaintiff's Equifax credit report, Plaintiff's credit report was mixed with personal identification information and credit account information, which belongs to Plaintiff's twin brother.

151. Equifax's inaccurate credit reporting adversely impacted Plaintiff's credit score and caused her credit application to be denied by Rocket Mortgage.

## Plaintiff's Mixed Credit Files as of November 2021

152. As it turns out, for most of Plaintiff's adult life, she has been denied un-mixed credit reports of her own because Equifax, Experian, and Trans Union all failed to recognize her as her own person by merging or mixing her twin brother's data within credit reports anchored by her own Social Security Number, yet including much personal and credit data that is not her own.

153. Plaintiff was informed in the summer of 2021 by some finance directors at automobile dealerships that her twin brother's automobile loan with Randolph-Brooks Federal Credit Union was reporting on her credit reports, thus lowering her credit scores and having a negative impact on her debt-to-credit ratio.

154. Being rightfully concerned about her numerous credit denials and low credit scores, and worried that there might be even more inaccurate information within her credit reports, Plaintiff worked in concert with her twin brother to gain a better understanding of the credit related problems they both were experiencing.

155. On or about November 14, 2021, Plaintiff, along with her twin brother, both filled out a separate FTC approved "Annual Credit Report Request Form" (ACRRF) requesting reports from Equifax, Experian, and TransUnion. These forms were sent via certified mail.

156. Plaintiff immediately experienced problems with her simple request, which was made pursuant to her right under federal law. In fact, Plaintiff <u>did not receive a single credit report response</u> from any bureau from her ACRRF request, despite the fact that it was confirmed delivered by certified mail on November 19, 2021. While the details are unknown, it appears likely that she missed out on her free reports as a direct consequence of the mixing and merging problems they both were experiencing. In other words, Equifax, Experian ,and TransUnion likely thought she had made two requests instead of one on her own.

157. Plaintiff also attempted to get copies of her free credit reports using the Annual Credit Report Request Service's online portal. She was unable to access her

reports through the portal, though, because one or more of the security questions related to her twin brother's credit history, not her own.

158.    Plaintiff resorted to other unconventional methods, involving her twin brother. For example, Experian sent a mixed file report dated November 22, 2021, which was anchored with her SSN and containing mostly her information. But Experian addressed the report to her twin brother and sent it to him at his address in Kyle, Texas as well (Credit Report #0180-5023-70 dated November 22, 2021).



**:experian.**™

**Your Credit Report**
Report # **0180-5023-70** for **Nov 22, 2021**

**Hi, Adairius D. Welcome to your Credit Report.**

159.    The Experian report contained accounts that do not belong to Plaintiff, including her twin brother's car loan. It also contained personal identification information including names, employers, addresses, and phone numbers that belong to her twin brother. Experian had also disseminated Plaintiff's report to multiple lenders who made inquiries in response to credit applications initiated not by

Plaintiff, but by her twin brother.

160.   Plaintiff obtained her Equifax report directly from its website. The report was fully mixed including names, employers, addresses, and phone numbers that belong to her twin brother. Equifax had also disseminated Plaintiff's report to multiple lenders who made inquiries in response to credit applications initiated not by Plaintiff, but by her twin brother.

161.   In November 2021, Plaintiff's twin brother obtained Plaintiff's Trans Union report by using HIS name, but HER social security number (TU report file number 385066264) using the Annual Credit Report Request Service's online portal.

162.   The credit report was fully mixed, even stating: "Personal Credit Report for: Adairius Norwood" but then, ironically, the first name listed is "Adair D. Norwood."

163.   The report was anchored on Adair's SSN and the remainder of the report included accounts and personal information, including names, employers, addresses, and phone numbers that belong to Plaintiff's twin brother, which was substantially commingled between the twins. Trans Union had also disseminated Plaintiff's report to multiple lenders who made inquiries in response to credit applications initiated not by Plaintiff, but by her twin brother.

## Disputes of Trans Union's Reporting

164.   On or about December 8, 2021, Plaintiff sent a letter to Trans Union disputing information in its credit report about her.

165.   In this first letter, Plaintiff explained that information about her twin

brother was on her credit report. She provided her full name, address, social security number, and date of birth. Additionally, she provided copies of her Texas Driver's License and her social security card. She also included both for her twin brother, as well, to further show Trans Union that they were in fact two separate people.

166. Plaintiff further protested the use of her twin brother's name, his addresses (recent and older), her mother's phone number and other numbers that were not Plaintiff's, and her brother's former employers. For example:

Errors - Name:

"Personal Credit Report for: ADAIRIUS NORWOOD" This is my brother's name. It has never been my name. Please delete all references to my brother's name on my credit reports in the future.

"AKA ADAIRIUS NORWOOD" Again, this is my brother's name. It has never been my name, nor have I ever been known under his name as any alleged "aka".

167. Plaintiff also disputed two separate debt collection accounts for "Webbank Freshstart" and a "six flags fiesta Texas" account that is not hers:

Errors – Adverse Accounts – Not Mine

WEBBANK/FRESHSTART; Account #: 636992031320****; 13300 PIONEER TRAIL EDEN PRAIRIE, MN 55347; (866) 734-0342

This is not my account. Moreover, it's internally inconsistent and makes no sense. For example, it states that the account was opened on 11/6/2015 and the last payment was made on 11/4/2015. How is that even possible? Please delete this account.

CONSUMER ADJ CO; Account #: 1277****; Address 514 Earth City Plaza, SUITE 100 SAINT LOUIS, MO 63045; Phone (866) 509-2009; Original Creditor SIX FLAGS FIESTA TEXAS 20; There is no Date of First Delinquency listed on this tradeline either, so it's impossible determine the age.

168. Plaintiff further disputed the addition of her brother's car loan with

Randolph-Brooks Federal Credit Union:

Errors – Accounts – Not Mine

RANDOLPH-BROOKS FCU; Account #: 21266****; Address PO BOX 2097 UNIVERSAL CTY, TX 78148-2097; Phone (800) 580-3300; Monthly Payment $406; Date Opened 04/09/2020 This account is my brother's car loan. It is not mine. Please delete it.

169.    Plaintiff also disputed several hard credit pulls that belong to her twin brother. For example:

Errors – Several Inquiries – Not Mine

The following credit pulls were not approved by me and do not belong on my credit report please remove them:

CAPITAL ONE NA; Location 15000 CAPITAL ONE DRIVE US364412 RICHMOND, VA 23238
Requested On 05/25/2021; Phone (800) 955-7070

RBFCU LP, Location 1 RANDOLPH PKWY LIVE OAK, TX 78233; Requested On 03/16/2021, 03/12/2020, 01/12/2020; Phone (800) 580-3300

RANDOLPH BROOKS FCU via RBFCU; Location PO BOX 2097 UNIVERSAL CITY, TX 78148
Requested On 03/16/2021, 03/12/2020, 01/11/2020; Phone (800) 580-3300

WELLSFARGODEALERSVCS; Location PO BOX 1697 WINTERVILLE, NC 28590; Requested On 04/09/2020; Phone (949) 727-1111

CHRYSLER CAPITAL; Location 8585 N STEMMONS FWY DALLAS, TX 75247; Requested On 04/09/2020; Phone (214) 614-3308

YAKLIN CHRYSLER DODGE via NCC YAKLIN CHRYSLER DODGE; Location 1550 W KINGSBURY ST SEGUIN, TX 78155; Requested On 04/09/2020; Phone (830) 303-3005

EXETER FINANCE CORP; Location PO BOX 166097 IRVING, TX 75016; Requested On 03/16/2020; Phone (800) 321-9637

CHUCK NASH SEGUIN via ODECHUCK NASH PRE OWNED; Location 838 W COURT ST SEGUIN, TX 78155; Requested On 02/07/2020, 02/07/2020; Phone (830) 433-9331

>Please also eliminate all promotional and account review inquiries that do not belong to me.

170. Plaintiff also explained her frustration at being denied a copy of her credit report by Trans Union via her written request to the Annual Credit Report Service:

>Please immediately delete all of my brother's accounts and other information from my report going forward. Also, I requested a report via the Annual Credit Report Request Service and it was certified delivered (USPS Certified: 9407111898765851536000) on November 19, 2021 but I have yet to receive a copy. Please fix your files so I may be able to receive my annual report for free as is my right.

171. Finally, Plaintiff also demanded compliance with Texas law as follows:

>Finally, pursuant to Texas Finance Code § 392.201, as a person with information within TransUnion's registry, I formally make this written request and demand for "a copy of all information" contained in TransUnion's files concerning me. Under Texas law, I have a right to this information no "later than the 45th day after the date of th[is] request…." I need "all information" because my credit reports are so mixed up with my brother's information and other data I do not recognize as outlined above.

172. Trans Union never complied with Texas law, completely ignoring Plaintiff's request to see the contents of Trans Union's files to this day.

173. Plaintiff included copies of both her and her twin brother's Texas driver's licenses and social security cards to demonstrate clearly to Trans Union that they were indeed two separate people.

174. Despite Plaintiff's pleas and requests, Trans Union apparently made no attempt to rectify the situation, nor did it respond to her letter.

175. On or about February 15, 2022, Plaintiff sent a second dispute letter to Trans Union (sent via certified mail and receipt confirmed) that was largely

duplicative of the first letter. Plaintiff expressed her frustration at Trans Union's lack

of responsiveness:

> My name is Adair Da'Ann Norwood. I previously wrote to you in December 2021 complaining about the below listed inaccuracies. This is a follow-up to my prior letter because you have failed to notify me that you have fixed all the errors I previously identified. Here is a recap. Last November 2021, your company provided my consumer credit report via the www.annualcreditreport.com website, but access was only given using my SSN and my brother's name which is Adairius De'Airrick Norwood. In fact, instead of having my own distinct individual credit report, TransUnion has commingled ALL of our accounts and information into one credit report file. I have made phone calls and objections in the past attempting to alert you to these mix-up issues, but no corrective actions have been taken to date. TransUnion states that "Our goal is to maintain complete and accurate credit information. It's our commitment to you." That goal remains unmet unfortunately.

176. Plaintiff again requested that Trans Union stop mixing and merging her

financial and other credit file information with her brother's:

> Again, errors made by your company are preventing me from obtaining credit and have also lowered my credit scores and ratings. These errors are driving up my financial costs. Consequently, I need all errors and mix-ups to be fixed immediately. Below I have identified numerous items that are being reported incorrectly. Please review the following items, make the appropriate corrections, and send me a complete copy of my updated credit file as soon as possible.

177. Plaintiff again included both the relevant credit report number and file

number for ease of reference for Trans Union, along with her DOB and SSN. Plaintiff

next repeated her prior protests again showing the information that belonged to her

and not her brother. Plaintiff also again included copies of both her and her twin

brother's Texas driver's licenses and social security cards to show Trans Union that

they were indeed two separate people.

178. Trans Union again ignored both of Plaintiff's requests that Trans Union

fix its errors.

179. Instead of properly investigating Plaintiff's problems caused by Trans

Union, it next began a rather strange attack on Plaintiff's dispute letters.

180. Indeed, Plaintiff next received a one-page letter from Trans Union dated February 26, 2022, whereby Trans Union claimed that it thought Plaintiff's recent disputes weren't in fact made by her "or a properly authorized third party."

181. On or about May 5, 2022, Plaintiff wrote another dispute letter which began by denying Trans Union's allegations and demanding that Trans Union explain itself:

My name is Adair Da'Ann Norwood. I previously wrote to you in December 2021 and February 2022. I am in receipt of your one-page letter dated February 26, 2022. I have serious issues that you are continuing to ignore. You stated:

We applaud your recent efforts to take charge of your credit. We want you to know we're on your side, and we're here to help support you on your path toward credit health.

Thanks. I have been trying get things fixed, but it doesn't appear that you are "on my side" as you say because you continue to ignore me improperly and repeatedly. You haven't given any "support" to me on my "path toward credit health" as you say. Indeed, your actions have been quite the opposite. You seem determined to block my efforts.

182. Instead of properly investigating Plaintiff's problems caused by Trans Union, it next began a rather strange attack on Plaintiff's dispute letters. Trans Union outrageously accused Plaintiff of possibly having had a "credit repair company" author the dispute letters previously sent to Trans Union, or otherwise having sent "unauthorized" dispute letters. Consequently, Plaintiff further copied portions of Trans Union's letter and then responded to Trans Union's allegations:

support you on your path toward credit health...

We recently received a request that included your information, but it didn't appear that you or a properly authorized third party sent it to us. We take the privacy and security of your data very seriously, so we won't process requests unless they come directly from you or an authorized third party. If you're working with a third party such as a credit repair company or "credit clinic," they have to identify themselves in their communications to us, and provide proof that you've authorized them to communicate with us on your behalf.

I have no idea where you get your information. I am <u>not</u> "working with" any so-called "credit repair company" or "credit clinic." Any such assertion or belief is patently false. Please inform as to the basis for your conclusions.

them to commun...

It's important to know that if you see something on your TransUnion credit report that you believe is inaccurate, you can dispute it easily and securely on your own for free, without paying a fee to any company. Find out more about how to manage the information on your TransUnion credit report at transunion.com/repairletter.

I am not paying any "fee" to any credit repair companies or credit clinics as you've suggested. Instead of worrying about such things, please get to work on all the inaccuracies I've identified below (and in my previous letters.

credit repair and your rights a...

You can count on us as a resource as you work to achieve your credit health goals - we want you to be able to get the financial opportunities you deserve.

You've done nothing to date to make me believe I can "count on you" "as a resource" to "achieve" my "credit health goals." Instead, you seem to appear to be actively ignoring good faith efforts to resolve the issues. Please do your job. I do want "the financial opportunities I deserve."

183.   Plaintiff next repeated all of the inaccuracies and mixed files and accounts that she wrote to Trans Union about in her previous two letters:

So, the remainder of this letter is an additional attempt and follow-up to my prior two letters because you have yet again failed to notify me that you have fixed all the errors I previously identified. Here is a recap. Last November 2021, your company provided my consumer credit report via the www.annualcreditreport.com website, but access was only given using my SSN and my brother's name which is Adairius De'Airrick Norwood. In fact, instead of having my own distinct individual credit report, TransUnion has commingled ALL of our accounts and information into one credit report file. I have made phone calls and objections in the past attempting to alert you to these mix-up issues, but no corrective actions have been taken to date. TransUnion states that "Our goal is to maintain complete and accurate credit information. It's our commitment to you." That goal remains unmet unfortunately.

184.   Plaintiff ended her letter again showing her frustration with Trans

Union:

> Please immediately delete all my brother's accounts and other information from my report going forward, or just give me a report of my own. Also, please fix your files so I may be able to receive my annual report for free as is my right.

> Finally, again, pursuant to Texas Finance Code § 392.201, as a person with information within TransUnion's registry, I formally make this written request and demand for "a copy of all information" contained in TransUnion's files concerning me. Under Texas law, I have a right to this information no "later than the 45th day after the date of th[is] request…." I need "all information" because my credit reports are so mixed up with my brother's information and other data I do not recognize as outlined above. Your 45-day limit expired long ago.

185.   Despite her pleas, Trans Union yet again ignored Plaintiff's requests that Trans Union fix its errors.

186.   Instead, Trans Union sent a small postcard that was directed to Plaintiff's attention, but instead was inexplicably sent to her twin brother's address, which left them both increasingly confused, upset, and frustrated:



187.   Within the postcard, Trans Union stated:

Date Issued: 5/18/2022
Re: Proof of Address Unacceptable - Reason # 4

below.

Reason #4: Only one form of proof was provided. Two (2) acceptable documents are required. Please provide two (2) current documents from the list here: - Driver's License - State ID Card - Bank or Credit Union Statement - Cancelled Check - Government-Issued ID Card - Signed Letter from Homeless Shelter - Stamped P.O. Box Receipt - Utility Bill (Water, Gas, Electric, or Telephone) - Pay Stub. Be sure bank statements, utility bills, canceled checks and pay stubs are not more than 2 months old. All state-issued license and ID cards must be current and unexpired. P.O. box receipts and signed letters from a homeless shelter must be less than 1 year old. Electronic statements printed from a website cannot be accepted as proof of address.

## Dispute of Experian's Reporting – October 2021

188.    In or about October 2021, Plaintiff sent an online dispute to Experian because her twin brother's auto loan was mixed in with, and reporting on, her credit report. (Report # 0847-2623-22).

189.    Remarkably, Experian didn't remove her twin brother's account as it should have. Instead, Experian sent its "dispute results" confirming the alleged legitimacy of the account. Remarkably, instead of sending the results to Plaintiff, Experian instead sent those results to her twin brother's address in San Marcos, Texas, addressing the letter to him as well. Plaintiff was both shocked and annoyed. She did not understand how or why this was happening.

## Dispute of Experian's Reporting – January 2022

190.    On or about January 6, 2022, Plaintiff sent a letter to Experian disputing information that was addressed to her twin brother and included his residence, but was anchored with her Social Security Number.

191.    In this letter, Plaintiff explained that information about her twin brother was on her credit report. She provided her full name, address, Social Security Number, and date of birth. Additionally, she provided copies of her Texas Driver's License and her Social Security card. She also included both for her twin brother, as

well, to further demonstrate for Trans Union that they were in fact two separate people.

192. Plaintiff further protested the use of her twin brother's name, his current and former addresses, and phone numbers, all of which do not belong to her. For example:

**Errors – "Your Personal Information" -- Names**

The following names are not mine: "Adairius Norwood" "Adairius D Norwood" "Adairius Deairrick Norwood" and "Adair Da Norwood" and Adair Daan Norwood."

**Errors – "Your Personal Information" -- Addresses**

Each of the Waco addresses listed are mine. The remainder are not mine.

**Errors – "Your Personal Information" – Telephone Numbers**

My current phone number is 254-981-0228. My old phone number is 254-548-7969. The other two phone numbers listed are not mine 254-548-7963 and 254-716-7192.

193. Plaintiff further again disputed the addition of her brother's car loan with Randolph-Brooks Federal Credit Union:

**Errors – Accounts – Not Mine**

RANDOLPH-BROOKS FCU; Account #: 21266****; Address PO BOX 2097 UNIVERSAL CTY, TX 78148-2097; Monthly Payment $406; Date Opened 04/09/2020. This is not mine. Please delete it immediately.

194. Plaintiff also disputed two separate accounts for "Webbank Freshstart":

**Errors – Adverse Accounts – Not Mine**

WEBBANK/FRESHSTART; Account #: 636992031320****; 6250 Ridgewood Road, St. Cloud, MN 56303. This account allegedly relates to a "Sales Contract" from November 2015. This is not mine. Please delete it immediately.

195. Plaintiff also disputed several hard credit pulls that belong to her twin

brother. For example:

<b>Credit Applications / Hard Inquiries – Mine</b>

The following hard inquiries were NOT approved by me and DO NOT belong on my credit report: CHUCK NASH SEGUIN via ODECHUCK NASH PRE OWNED; Location 838 W COURT ST SEGUIN, TX 78155; Requested On 02/07/2020; Phone (830) 433-9331; DT CREDIT, PO BOX 2997 Phoenix, AZ 85062, (888)418-1212; Date requested on 12/2/2019, 3/27/2020 and 11/16/2021; FIRST ADVANTAGE/RESIDENT DATA, 12770 Coit Rd, Suite 1000, Dallas, TX 75251 (800) 888-5773, Requested on 5/21/2021; CAPITAL ONE AUTO FINANCE, PO BOX 259407, Plano, TX 75025 (800) 946-0332, Date Requested 4/9/2020; GLOBAL LENDING SERVICES, 3399 Peachtree Rd. NE, Suite 400, Atlanta, GA 30326, (888) 508-2188; NCCINC/YAKLIN CHRUSLER D, 1550 W. Kingsbury Street, Seguin, TX 78155, Date Requested 4/9/2020; NOWCOM/WESTLAKE FINANCIAL, 4751 Wilshire Blvd., Los Angeles, CA 90010, Date Requested 3/16/2020 & 4/9/2020; SANTANDER CONSUMER USA, 5201Rufe Snow Dr. North Richland Hills, TX 76180, Ph: 866-923-9282, Requested on 3/16/2020; CARMAX, 225 Chastain Meadows Ct. NW, Kennesaw, GA 30244, Ph. 770-423-7908, Requested on 3/16/2020; 700 CREDIT/HEWITT AUTO PL, 847 N. Hewitt Dr., Hewitt, TX 76643, Requested on 4/4/2020. Please delete them.

196. On January 17, 2022, and January 18, 2022, Experian sent two responses to Plaintiff's disputes. Experian did not delete the "Webbank/Freshstart" account but rather confirmed it. However, Experian did finally eliminate her twin brother's Randolph-Brooks auto loan. Experian also purported to eliminate her twin brother's name and addresses from her report. But these were reinserted and present on her June 11, 2022 credit report.

### Dispute of Equifax's Reporting - December 2021 and February 2022

197. On or about December 28, 2021, Plaintiff sent a letter to Equifax disputing information in its credit report about her.

198. In this first letter, Plaintiff explained that information about her twin brother was on her credit report. She provided her full name, address, social security number, and date of birth. Additionally, she provided copies of her Texas Driver's License and her social security card. She also included both for her twin brother, as

well, to further show Equifax that they were in fact two separate people.

199. Plaintiff further protested the use of her twin brother's name, his addresses (recent and older), phone numbers that were not Plaintiff's, and her brother's former employers. For example:

<b>Errors – Personal Information – Name:</b>

**"ADAIRIUS NORWOOD"** This is my brother's name. It has never been my name. Please delete all references to my brother's name on my credit reports in the future and eliminate his accounts as well.

<b>Errors -- Addresses:</b>

3085 N STATE HIGHWAY 123 APT 2108 SAN MARCOS, TX 78666-3989; Date Reported 04/01/2021

1000 W COURT ST APT 3152 SEGUIN, TX 78155; Date Reported 05/01/2020

200. Plaintiff also disputed certain collection accounts that are not hers as follows:

<b>Errors – Collections Accounts – Not Mine</b>

CONSUMER ADJUSTMENT COMPANY; Account #: ******05; Address 514 Earth City Plaza, SUITE 100 SAINT LOUIS, MO 63045; Phone (866) 725-0043; Original Creditor SIX FLAGS FIESTA TEXAS 20; The Date of First Delinquency listed as January 29, 2021. I have not attended any Six Flags location in years. This account is not mine. Please delete it immediately.

CAPITAL ACCOUNTS LLC; Account Number: #####40; Address: 1642 Westgate Circle, Brentwood, TN 37027; Phone: 866-854-5359; Original Creditor: Saddle Creek Dental PA; Date of First Delinquency: May 18, 2016. This is not my account. Please delete it immediately.

201. The debt collection account for "Capital Accounts, LLC" was related to dental work performed for her twin brother, not herself. Nevertheless, her credit scores suffered mightily directly due to these mixed collection accounts.

202. Next, Plaintiff disputed the inclusion of her twin brother's student loan

on her report:

### Errors – Accounts – Not Mine

TEXAS LUTHERAN COLLEGE-ST LOAN; Account Number: xxxxxxxxxxxx4AD9; Balance $2,591; High Credit: $3,000; Date Opened: September 30, 2015. This is not my account. Please delete it. This is my brother's account.

203.    Next,  Plaintiff also disputed several hard credit pulls that belong to her

twin brother. For example:

### Errors – Several Inquiries –
### Not Mine

The following credit pulls were not approved by me and do not belong on my credit report please remove them:

ALLY  FINANCIAL,  PO  BOX  380901,  BLOOMINGTON,  MN  55438, 4/9/2020; 3/16/2020

GLOBAL  LENDING  SERVICES,  INC.,  1200  BROOKFIELD, GREENVILLE,  S.C. 29607-6583; 4/9/2020

Public Automotive Group – Waco, 3301 Franklin Ave. Waco, TX 76710; 2/8/2020

CAPITAL ONE NA; Location 15000 CAPITAL ONE DRIVE US364412 RICHMOND, VA 23238 Requested On 05/25/2021, 4/09/2020; Phone (800) 955-7070

YAKLIN  CHRYSLER  DODGE  via  NCC  YAKLIN  CHRYSLER  DODGE; Location 1550 W KINGSBURY ST SEGUIN, TX 78155; Requested On 04/09/2020; Phone (830)
303-3005

CHUCK NASH SEGUIN via CHUCK NASH PRE OWNED; Location 838 W COURT ST SEGUIN, TX 78155; Requested On 02/07/2020, 02/07/2020; Phone (830) 433-9331

204.    Equifax completely ignored Plaintiff's disputes and never responded in

writing, or otherwise.

205. On or about February 21, 2022, Plaintiff sent a second dispute letter to Equifax that was largely duplicative of the first letter. Plaintiff expressed her frustration at Equifax's lack of responsiveness:

> My name is Adair Da'Ann Norwood. I recently wrote to you about my problems in a letter dated December 28, 2021, but I received no response, so I write to you again hoping something changes. On December 6, 2021, your company provided my consumer credit report via the www.equifax.com website. This letter and my previous December letter both concern that report, but also similarly inaccurate reports that I've complained to you about previously. For example, my brother's name is Adairius De'Airrick Norwood and you've repeatedly mixed the two of us up in your reporting which describe in detail below. In fact, instead of having my own distinct individual credit report, Equifax has commingled numerous of our accounts and information into my credit report. I have made phone calls and objections in the past attempting to alert you to these mix-up issues, but no substantive corrective actions have been taken to date. Equifax is essentially treating us as the same person. I am growing increasingly frustrated. The mistakes made by Equifax continue to cause harm to me.

206. On or about March 2, 2022, Equifax sent a response informing that the items complained of regarding her twin brother's account were no longer "currently being reported" on her credit report.

## The Credit Bureaus' Method for Considering Consumer Credit Report Disputes

207. The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

208. The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency- created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha

language specific to the credit reporting industry.

209.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II." It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

210.    Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

211.    Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

212.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

213.    These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

214.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

215.    The data furnishers then have an obligation under the FCRA to conduct a reasonable investigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine

whether the disputed credit account information is accurate and/or belongs to the disputing consumer. *See* 15 U.S.C. § 1681s-2(b).

216.    Once the data furnisher completes its investigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via eOSCAR.

**The Credit Bureaus' Responses to Plaintiff's Various Disputes**

217.    On multiple occasions between 2020 and 2022, Equifax, Experian, and Trans Union failed to respond to Plaintiff's multiple disputes within 30 days, as mandated by the FCRA, after receiving such disputes and the supporting documentation Plaintiff attached thereto, and failed to conduct *any* reinvestigations of the specific information that Plaintiff disputed as inaccurate in her credit files and reports and as not belonging to her.

218. In regard to the disputes that Equifax and Experian did reinvestigate and respond to, both Equifax and Experian violated 15 U.S.C. § 1681i by failing to delete inaccurate information in Plaintiff's credit files and reports after receiving notice of such inaccuracies; by failing to conduct lawful reinvestigations; by failing to forward all relevant information to the respective furnishers; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit files and reports.

219.    To date, Trans Union has failed to reinvestigate even one of Plaintiff's

disputes, in violation of 15 U.S.C. § 1681i(a)(1)(A).

220. To date, neither Equifax, Experian, nor Trans Union have corrected or removed all the personal identification information, credit accounts, and hard inquiries disputed by Plaintiff, which belong to her twin brother, and which continue to appear in Plaintiff's Equifax, Experian, and Trans Union credit reports.

## DAMAGES

### Actual Damages

221. Plaintiff has suffered, continues to suffer, and will suffer future damages, including the loss and denial of credit, lost credit opportunities, damage to reputation, invasion of privacy, emotional distress, including stress, anxiety, pain, anguish, physical illness, embarrassment, humiliation, and constant and continuing stress, all as a consequence of having her personal identification information and credit account information inextricably merged within her twin brother's credit history, file, and reports. Plaintiff has also expended significant time and money disputing and trying to correct the inaccurate reporting.

222. As a result of Defendants' conduct, action, and inaction, Defendants caused Plaintiff repeated credit denials as outlined above. Every time over the last nearly two (2) years that Plaintiff has applied for credit cards or installment loans where the creditor requested Plaintiff's various credit reports, Plaintiff has either been rejected or incurred increased costs of credit due to the inaccurate credit information contained within her, but technically her twin brother's, credit file and reports.

223.    For example, as detailed above, each time Plaintiff tried to refinance her car at a lower rate (or even buy a new car, potentially), she was rejected despite the low interest rate environment others were enjoying. She was even rejected for a mortgage pre-approval.

224.    Defendants have also violated Plaintiff's privacy. For example, for most of Plaintiff's adult life, but increasingly over the last two (2) years, Defendants disseminated Plaintiff's information without her knowledge or authorization to over a dozen or more of her twin brother's potential creditors when she applied for credit lines and other financing. This was very upsetting to Plaintiff. Defendants also sent reports containing her information to her twin brother. They even sent correspondence meant for her to her twin brother's residences.

225.    While Plaintiff and her twin brother get along just fine, Adair prefers to keep her finances private. She's been upset that Defendants merged or mixed her information and unlawfully disclosed to her brother her credit history and she likewise felt uncomfortable viewing her twin brother's personal and credit information when Defendants sent and published his information to Plaintiff. Just because they are family members and twins does not make it acceptable for Defendants to violate Plaintiff's and her twin brother's right to privacy in their personal and private credit information and financial affairs.

226.    Defendants' ongoing refusal to reinvestigate Plaintiff's concerns and correct her reports caused extreme frustration, stress, anxiety, and annoyance to Plaintiff. Also, although rationally she knew that it was Defendants' fault, she still

felt disappointed in herself and depressed. This ongoing credit nightmare has impeded Plaintiff's ability to move forward with her young adult life and reduced her chances of getting on a firm financial footing.

227.  Plaintiff has also experienced nervousness, restlessness, and even panic leading up to virtually any given credit situation.

228.  Plaintiff has also had trouble concentrating, insomnia and tiredness, and a lack of motivation as a direct result of her credit difficulties caused by Defendants. After yet another credit denial, sometimes Plaintiff feels and thinks about what the point of graduating from college and starting a career was and what also is the point of continuing to make money while still being hamstrung due to her ongoing credit issues caused by the merged files.

229.  Defendants also made Plaintiff physically ill, including the triggering of literal headaches and extreme tension at times.

230.  Finally, Defendants actions and inactions caused Plaintiff to suffer emotional distress, including stress, anxiety, and embarrassment, as described throughout this Complaint.

231.  Plaintiff continues to experience extreme anxiety, frustration, stress, depression, and even embarrassment about her financial reputation and future.

232.  Defendants' credit reports about Plaintiff remain inaccurate and she feels trapped, hopeless and depressed, and unable to move forward with her financial life as a direct result of Defendants' actions and inactions.

233.  Things have digressed such that she recently had to switch her dog to a

service animal role in her life.

234.    All of Plaintiff's damages were foreseeable to Defendants who know from many years of past litigation over their wrongful verification and dissemination of inaccurate information the devastating consequences that false credit reporting can have on consumers.

## Punitive Damages

235.    Based on a review of public record lawsuit filings, Defendants each have long histories of wrongful and inaccurate credit reporting, including mixing and merging two different consumers' credit files and reports.

236.    For decades, consumers, state attorneys general, and regulatory agencies have been suing Defendants for their refusal to assure the maximum possible accuracy of their reports and for their refusals to conduct reasonable reinvestigations of consumers' disputes.

237.    Defendants' unlawful policies and procedures evince willfulness and reckless disregard for the rights and interests of consumers, which directly lead to the injuries suffered by Plaintiff as described herein.

## CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Defendants Equifax, Experian, and Trans Union)

238.    Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-237 as if fully stated herein.

239.   Defendants Equifax, Experian, and Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files they published and maintain concerning Plaintiff.

240.   As a result of Defendants Equifax, Experian, and Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from her good name and credit rating; detriment to her credit rating and debt-to-income ratio; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and constant stress of having another consumer's personal identification information and credit account information mixed into her credit files.

241.   Defendants Equifax, Experian, and Trans Union's conduct, action, and inaction was willful, rendering them each separately liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

242.   Plaintiff is entitled to recover attorney's fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform a Reasonable Reinvestigation**

**(Second Claim for Relief Against Defendants Equifax, Experian, and Trans Union)**

243.   Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-237 as if fully stated herein.

244.   Defendants Equifax, Experian, and Trans Union violated 15 U.S.C. § 1681i by failing to delete inaccurate information in Plaintiff's credit file after they received notice of such inaccuracies; by failing to conduct a lawful reinvestigation of disputed personal information, credit accounts, and hard inquiries within the 30-day time frame outlined in the FCRA; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit files.

245.   As a result of Defendants Equifax, Experian, and Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from her good name and credit rating; detriment to her credit rating and debt-to-income ratio; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and constant stress of having another consumer's personal identification information and credit account information mixed into her credit files.

246.   Defendants Equifax, Experian, and Trans Union's conduct, action, and inaction was willful, rendering them each separately liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff

to recover under 15 U.S.C. § 1681o.

247. Plaintiff is entitled to recover attorney's fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C.§ 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681b(a)**
**Furnishing a Credit Report Without a Permissible Purpose**
**(Third Claim for Relief Against Defendants Equifax, Experian, and Trans Union)**

248. Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-237 as if fully stated herein.

249. This action involves the willful, knowing, and/or negligent violation of the FCRA relating to the publication of consumer credit and other financial information.

250. Plaintiff is a "consumer" as defined by the FCRA.

251. Defendants Equifax, Experian, and Trans Union are consumer reporting agencies that furnish consumer reports as defined and contemplated by the FCRA.

252. The FCRA prohibits any consumer reporting agency from furnishing a consumer report unless it has a permissible purpose enumerated under the FCRA, 15 U.S.C. § 1681b(a).

253. On multiple occasions, Defendants Equifax, Experian, and Trans Union furnished Plaintiff's credit reports to various creditors without a permissible purpose in response to applications of credit initiated by her twin brother, which did not

involve Plaintiff and which Defendants Equifax, Experian, and Trans Union therefore had no reason to believe that the various creditors intended to use Plaintiff's credit information in connection with a credit transaction involving Plaintiff, in violation of 15 U.S.C. § 1681b(a).

254. As a result of Defendants Equifax, Experian, and Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from her good name and credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and constant stress of having another consumer's personal identification information and credit account information mixed into her credit files.

255. Defendants Equifax, Experian, and Trans Union's conduct, action, and inaction was willful, rendering them each separately liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

256. Plaintiff is entitled to recover attorney's fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

a)     Determining that each Defendant negligently and/or willfully violated the FCRA;

b)     Awarding Plaintiff actual damages, statutory, and punitive damages as provided by the FCRA;

c)     Awarding Plaintiff reasonable attorneys' fees and costs from each Defendant as provided by the FCRA; and

d)     Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

257.   Plaintiff demands a trial by jury.

Dated: June 9, 2023

s/ Tod A. Lewis
Tod A. Lewis, TX Bar No. 24091999
TOD LEWIS LAW, PLLC
13267 Darwin Lane
Austin, TX 78729-7495
Telephone: (512) 739-0390
Fax: 1 (737) 205-1291
tod@texasfaircredit.com

s/ Hans W. Lodge
Hans W. Lodge, MN Bar No. 0397012
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 607-7794
Fax: (612) 584-4470
hlodge@bm.net

*Attorneys for Plaintiff*